In re HANFORD NUCLEAR
RESERVATION
LITIGATION.

Master File No. CY–91–3015–AAM.

United States District Court,
E.D. Washington.

Feb. 7, 1995.

Federico C. Sayre, Law Office of Federico C. Sayre, Newport Beach, CA; and George Trejo, Contreras–Trejo & Trejo, Inc., P.S., Yakima, WA, for plaintiffs.

Ridgway M. Hall, Jr., Crowell & Moring, Washington, DC; J. Ronald Sim, Stoel Rives Boley Jones & Grey, Seattle, WA; James R. Moore, Jr., Perkins Coie, Seattle, WA; William R. Squires, Davis Wright Tremaine, Seattle, WA; David M. Bernick, Kirkland & Ellis, Chicago, IL, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST AMERICAN INDIAN FISHER PLAINTIFFS

McDONALD, District Judge.

This document relates to: *Wahpat,* CY–90–3091–AAM.

On January 19, 1995, the court heard oral argument on the defendants' motion for summary judgment against the *Wahpat* plaintiffs.[1] William Squires argued on behalf of the defendants, and Kevin McGuire argued on behalf of the plaintiffs.

The defendants filed a motion for summary judgment against the *Wahpat* plaintiffs premised on three grounds. The defendants alleged in their motion: 1) plaintiffs lack standing to maintain their claims; 2) plaintiffs have failed to demonstrate any evidence of economic injury; 3) scientific evidence demonstrates that in operating the Hanford Nuclear Reservation, the defendants caused

---

1. Unless otherwise specified, the term, "plaintiffs," refers to the *Wahpat* plaintiffs.

no decline in fish runs. Defendants' Motion for Summary Judgment (Ct.Rec. 399) at 1–2.

Because the parties determined that a resolution of the standing element of this motion could be dispositive, the parties agreed to bifurcate the issues and have oral argument on standing as an initial matter. The court heard oral argument on this portion of the summary judgment motion on August 23, 1994. On September 22, 1994, the court issued an order finding that since the plaintiffs alleged an injury to their right to engage in lawful business free from the defendants' interference, they did indeed have standing to bring their claims. (Ct.Rec. 451 at 10). In that order, the court scheduled briefing deadlines and a date for oral argument on the remaining issues raised by the defendants' motion. Thus, the fundamental issue before the court at this stage is whether the plaintiffs state sufficient evidence to support their claims in this litigation.

The defendants argue that since the plaintiffs have currently failed to produce any evidence of the economic injury which they claim in the joint complaint, summary judgment is required. The defendants further argue that besides plaintiffs' inability to demonstrate the requisite element of injury or harm, plaintiffs also cannot establish the essential element of causation. To support the latter argument, the defendants have produced a sizable amount of exhibits, including the affidavits of expert witnesses, which they claim demonstrate conclusively that the Hanford operations did not negatively impact the Columbia River fisheries.

The plaintiffs present two alternative bases upon which they contend the court should deny the defendants' motion. They first provide the affidavit of their own expert witness, which they claim either creates a genuine issue of material fact, or in the alternative, demonstrates that the defendants' motion may be premature. The plaintiffs' second point in opposition to the motion is that the defendants' motion is untimely when the court's Case Management Order is considered. They assert that the court should at least postpone the defendants' motion until there has been discovery on the issues of liability and causation. At oral argument, counsel for the plaintiffs primarily argued that any failure to produce evidence sufficient to withstand summary judgment is due to plaintiffs' inability to conduct comprehensive discovery on the issues presented in this motion.

For the reasons stated more fully below, the court is granting the defendants' motion for summary judgment thereby dismissing the claims of the Indian fishers from this litigation.

## BACKGROUND:

In 1990, following the publication of the report from the Technical Steering Panel of the Hanford Environmental Dose Reconstruction Project, several groups of plaintiffs filed five separate actions against the former Hanford operating contractors. The *Wahpat* action was one of the five initial actions filed before this court (CY–90–3091–AAM). It was somewhat distinctive in that it only alleged claims of economic injury[2] based on the alleged effects of Hanford on Native American fishing. In its Pretrial Order # 1, the court consolidated these five actions, and pursuant to that order, the collective plaintiffs subsequently filed a consolidated complaint. (Ct.Rec. 15).

Specifically, the plaintiffs claim that the release of effluent cooling water from the Hanford reactors into the Columbia river has damaged the fish and their habitat, thereby causing diminished returns of adult salmon to Zone 6[3] of the Columbia. Plaintiffs' Memorandum (Ct.Rec. 496) at 5. In the consolidated complaint, the plaintiffs seek recovery for lost income, lost earning capacity, diminished property values, property damage, restoration and mitigation costs. (Ct. Rec. 15 at 45–46). According to the plaintiffs' conservative estimates, there are thou-

---

**2.** The plaintiffs acknowledge that their only claim is for economic injury caused by the alleged damage to Columbia River fish. Plaintiffs' Memorandum (Ct. Rec 496) at 1.

**3.** The American Indian Fishers' commercial fishing industry is limited to Zone 6 of the Columbia River, which encompasses the area between the Bonneville and McNary Dams. (Ct.Rec. 496 at 4).

sands of potential plaintiffs in the *Wahpat* class who have suffered economic losses to their livelihood and industry from 1943 to the present. (Ct.Rec. 496 at 4).

## FACTS:

■ The following facts are excerpted from both parties' Local Rule 56(a) statements of material fact, as well as their accompanying submissions.[4] Pursuant to Local Rule 56(c), any facts not controverted by the record are deemed to be admitted. For purposes of this motion, the court finds that there are no disputes of material fact.

### 1. Facts as Submitted by Defendants

Representative plaintiff Kenneth Wahpat is a Native American who alleges that he has suffered economic loss as a result of alleged releases of radioactive and non-radioactive hazardous substances by defendants to the Columbia River because those releases allegedly damaged the fish and their habitat. Representative plaintiff Donna Lopez is a Native American crew member who alleges a similar economic loss on the same grounds. Both Wahpat and Lopez fish under rights derived from the Treaty with the Yakamas of June 9, 1855.

Defendants are companies who at various times between 1943 and the present time provided services to the United States through contracts with the Department of Energy, and/or its predecessors, involving the operation of Hanford Nuclear Reservation.

From 1944 through 1987, cooling water used in relation to the operation of the reactors at Hanford was taken from and discharged to the Columbia River. These discharges of cooling water have been the principal source of radionuclides from Hanford to the Columbia River. From 1943 through 1963, nine reactors were constructed. The peak years of reactor discharges were 1958 to 1965. Reactor discharges flowed through most of the Hanford Reach, past Richland, and downstream to the Pacific Ocean. All of the discharges were to the Columbia River and not to any of its tributaries.

Pursuant to discovery proceedings, the plaintiffs have stipulated that their claims are solely for economic loss. In 1993, defendants served interrogatories upon plaintiffs which asked them to identify "when, how, where, and to what extent you contend the fishing industry has been harmed by Hanford operations" and "when, how, where, and to what extent you contend that your commercial fishing interest has been damaged by Hanford operation...." Defendants' First Set of Interrogatories Directed to Each Plaintiff, at 29–30 attached as Exhibit C to Ct.Rec. 402. In response to both questions, both plaintiffs Wahpat and Lopez responded, "Unknown at this time; discovery is continuing."

### A. Expert Witnesses

To support their argument that the discharges to the Columbia River did not cause any decline in the fish runs, the defendants provide three affidavits and a single deposition of four expert witnesses. These are fisheries biologist, Lauren R. Donaldson, Ph. D.; fisheries biologist Donald E. Bevan, Ph. D.; fisheries biologist Roy E. Nakatani, Ph. D.; former Chief Engineer for the Washington Department of Fisheries, Milo Bell, Ph.D.

### i. Lauren R. Donaldson, Ph.D.

Dr. Donaldson set up the Applied Fisheries Laboratory in 1943 to determine the effects of radiation on aquatic animals and plants. Video Deposition of Lauren R. Donaldson, Ph.D. at 29, attached as Exhibit G to Ct.Rec. 402. At the laboratory, Dr. Donald-

---

**4.** In addition to their statement of facts and the affidavit of their expert witness, plaintiffs additionally submit the affidavit of counsel, George Trejo. In the "affidavit," Mr. Trejo argues against the admissibility of defendants' expert witness, and he also asserts that plaintiffs' expert witness creates a genuine issue of material fact. *See* (Ct.Rec. 497 at ¶¶ 5–9, 11). Mr. Trejo's legal arguments and conclusions are not the proper subject matter of an affidavit. *See Automatic* *Radio Mfg. Co., v. Hazeltine Research, Inc.,* 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950), overruled on other grounds, *Lear, Inc. v. Adkins,* 395 U.S. 653, 671, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610 (1969) (affidavit of attorney must be made on personal knowledge, not information and belief). Consequently, the court treats this affidavit simply as a supplement to plaintiffs' response memorandum.

son conducted both short-term and long-term tests to assess the impact of radiation exposure to a fish population. *Id.* at 59, 61. In discussing the long-term studies conducted at the laboratory, he describes a process wherein the scientists initially exposed the subject fish, primarily chinook salmon, to gradually increasing exposure levels of radiation over the years levels. *Id.* at 85–86. Dr. Donaldson explains that these tests eventually revealed that it took an exposure level of above 10 roentgens per day to produce adverse effects in the fish which, according to Dr. Donaldson, is much higher than levels measured in the Columbia River downstream from the Hanford reactors. *Id.* at 106–07.

### ii. Donald E. Bevan, Ph.D.

In his affidavit, Dr. Bevan discusses the establishment of the Aquatic Biological Laboratory in 1945 at the location of the reactors of the Hanford Site. Affidavit of Donald E. Bevan in Support of Defendants' Motion for Summary Judgment at ¶ 16. This laboratory conducted studies on the effects of reactor effluent on organisms of the Columbia River and also monitored radiation in the water of the Columbia River. ¶ 20. Dr. Bevan states that concentrations of radionuclides in Columbia were highest from 1958 through 1965. ¶ 27. He states that the total dose received by the eggs and developing salmon was less than 1 roentgen. ¶ 27. Dr. Bevan states that this level of radiation actually experienced did not and could not have had any adverse effects on the fish. ¶ 27.

Dr. Bevan also maintains that the studies' conclusions are confirmed by the objective observations of the number of spawning chinook in the Columbia. ¶ 37. He observes that fish passage counts in the Columbia demonstrate no correlation to fluctuations in radioactive releases. ¶ 40–41. He additionally asserts that there is no correlation between the number of fall chinook salmon redds[5] and the amount of radioactivity released from Hanford. ¶ 51. Dr. Bevan in-

cludes as exhibits the various charts and tables which set forth the data on which he bases his observations.

### iii. Roy E. Nakatani, Ph.D.

Dr. Nakatani discusses studies, called "bioassays," conducted by the Aquatic Biological Section of the University of Washington which monitored salmonids and trout reared in diluted effluent from the Hanford reactors. Affidavit of Roy E. Nakatani in Support of Defendants' Motion for Summary Judgment at ¶ 18–19. The purpose of these bio-assays was to determine if any of the changes in the reactor effluent could have an impact on the fishery. ¶ 24. Dr. Nakatani states that these tests were done in varying dilutions of 0%, 2%, 4%, and 6% respectively. ¶ 26. He notes that 2% was generally the maximum low-river-flow concentration once discharge plumes dispersed in water. ¶ 26. According to Dr. Nakatani, a 2% concentration of reactor effluent had no adverse effects on salmon in their varying stages of growth. ¶ 29. He further notes that there were "no significant mortalities" for salmon reared in concentrations of effluent up to 6%. ¶ 30.

Besides addressing the direct biological effects of the chemical constituents in the effluent on the fish, Dr. Nakatani also discusses the thermal effects of the effluent discharge on the Columbia River, and concludes that the temperature of the reactor effluent did not adversely affect the fishery in the Columbia River. ¶ 47. He states that the studies performed by him and other scientists showed that the heat contributed by the effluent added only a relatively small heat increment to a widely variable seasonal river temperature. ¶ 49. Data obtained through sonic fish tags revealed that there was no temperature block in the migration path of the salmonids. ¶ 52.

### iv. Milo C. Bell, Ph.D.[6]

In his affidavit, Dr. Bell states that any declines in the numbers of fish were attribut-

---

**5.** Salmon "redds" are nests where salmon spawning occurs.

**6.** Counsel for the plaintiffs, George Trejo, argues that Dr. Bell is not qualified as a fisheries biologist but only as a fisheries engineer. Affidavit of

Counsel (Ct.Rec. 497) at 2. Based upon this premise, counsel asserts Dr. Bell does not have the experience necessary to justify his opinion that he has never seen any evidence that Hanford operations adversely impacted the fisheries in its

able to various human activities and natural forces which do not include the Hanford operations. Affidavit of Milo C. Bell in Support of Defendants' Motion for Summary Judgment at ¶ 19. Dr. Bell states that several major activities that have impacted the Native American fishery include: a) non-Indian fishing; b) irrigation diversions; c) various logging practices; d) construction of dams both on the Columbia and the tributaries. ¶ 35. Dr. Bell states that whenever a dam has been built, the construction period has disrupted the passage of fish, which "results both in reduced fish runs during construction and the possibility that runs four years hence will also be diminished." ¶ 42. Dr. Bell further claims, based on examination of data obtained from various fish counting points, that despite these detrimental human activities, the segment of the river downstream from Hanford has not changed appreciably in terms of the number of salmon migrating successfully through it over the years in question. ¶ 63–64. Like Dr. Bevan, Dr. Bell provides the documents containing this objective data as accompanying exhibits.

## 2. Facts as Submitted by Plaintiffs

To refute the defendants' statements of fact, the plaintiffs provide the declaration of their expert witness, fisheries biologist Dr. Thomas L. Welsh. The plaintiffs claim that Dr. Welsh establishes that there was an injury to the fish and therefore, an economic injury sustained by the plaintiffs. *See* Plaintiffs' Statement of Facts (Ct.Rec. 498) at ¶ 8.

### A. Thomas L. Welsh, Ph.D.

Dr. Welsh acknowledges the tests performed by Dr. Lauren Donaldson, as well as the effluent monitoring studies conducted by the Aquatic Biology Section of the University of Washington. Declaration of Thomas L. Welsh in Opposition to Defendants' Motion for Summary Judgment (Ct.Rec.501) at ¶¶ 14–15. His opinion regarding the Hanford effluent does not contest these studies to

the extent that they indicate no direct harmful biological effects on the Columbia salmon from the effluent. Rather, Dr. Welsh claims that the "drastic decline" in fall chinook salmon commercial landings, total number of fall chinook entering the Columbia, and the decline in fall chinook redds supports *two* distinct inferences regarding the effects of reactor effluent on salmonid populations. ¶ 19. His first inference is that these discharges produced adverse thermal effects, and his second inference is that the effluent has impaired the salmon olfactory homing capacity. ¶ 19.

Regarding the thermal effects that the expelled Hanford reactors' cooling water had on the Columbia River, Dr. Welsh asserts that his ability to predict thermal effects on the salmon has been impeded by his lack of data regarding the volumes and temperatures of the reactor cooling water that entered the Columbia. ¶ 17. Without this necessary data, Dr. Welsh claims that his analysis has been limited to "crude calculations" regarding the effects of these thermal additions. He concludes that "[e]ffluent discharges may have raised the Columbia River water temperatures between 3° and 6° F over ambient temperatures." ¶ 18. Dr. Welsh points out that this warming would cause premature emergence of the salmon in their early stages of growth, which would seriously impact population fitness. ¶ 18. He declares that salmon population declines would have been first noticed four years after the first brood-year fish encountered the warmer water.

Dr. Welsh maintains that the defendants' expert witnesses' own exhibits verify that the fall chinook salmon were so affected by revealing that the number of salmon redds declined from 787 in 1948, to only 65 in 1955. ¶ 18. He further notes that significant increases in redds occurred after the atomic reactors ceased their discharge of effluent into the Columbia. ¶ 18.

---

area. (Ct.Rec. 497 at 3). The defendants counter this claim by pointing out that for 60 years, Dr. Bell was involved in efforts to prevent loss of salmon runs—consequently, he has extensive expertise upon which to base his opinion. (Ct.Rec. 507 at 3 n. 1). The court need only consider Dr.

Bell's affidavit regarding his opinion as to other potential sources of adverse impact on the fishery; his controversial conclusion has already been stated by the defendants' expert fisheries biologists, regarding whom the plaintiffs have expressed no objection.

With regard to his second inference, Dr. Welsh explains that the general consensus among fishery biologists is that salmon depend primarily upon their sense of smell as their homing device. He claims that the effluent may have disrupted the odor cues for returning adult salmon. ¶ 19.

Although Dr. Welsh does not contest the accuracy of the objective data provided by defendants' experts in support of their testimony, he concludes that these objective observations, in fact, indicate that the construction and operation of the nuclear reactors in the Hanford Reach of the Columbia River caused an immediate decline in the salmon population. ¶ 20.

## DISCUSSION:

### 1. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner*, 780 F.2d 727 (9th Cir.1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

At the summary judgment stage, the court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. In resolving these issues, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.

1987); *see also Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Id.* at 586, 106 S.Ct. at 1355. Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The nonmoving party cannot manufacture a genuine issue of material fact so as to oppose a motion for summary judgment merely by making assertions in its legal memoranda. *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982); *Marks v. United States*, 578 F.2d 261, 263 (9th Cir.1978) (genuine issues are not raised by mere conclusory allegations).

Summary judgment is mandated against a party who fails to demonstrate the existence of a element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. The "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

### 2. Analysis of Parties' Arguments

Having resolved the standing prong of the defendants' argument in favor of summary judgment, the court need only consider the two remaining elements of the defendants' motion. The remainder of defendants' motion contends that the court should grant summary judgment based upon the plaintiffs' failure to demonstrate any evidence regarding two essential elements of their claim: causation and injury. Defendants' Memoran-

dum (Ct.Rec. 401) at 5. The defendants assert that for the plaintiffs to prevail on their claims, they must demonstrate evidence that they actually sustained the economic injury claimed in their complaint. Defendants argue further that the plaintiffs must also demonstrate that the Hanford operations actually damaged the Columbia River fishery.

To sustain their burden on summary judgment, the plaintiffs rely heavily upon the declaration of their expert witness. They claim that this declaration creates a genuine issue of material fact with regard to *both* prongs of the defendants' argument.

## A. Plaintiffs Establish No Genuine Issue Regarding Economic Injury

■ As the defendants correctly observe, "[a]n essential element of any tort claim is that the alleged wrongful act caused *harm* (emphasis added)." *Safeco Insurance Co. v. Butler,* 118 Wash.2d 383, 389, 823 P.2d 499 (1992); *Christensen v. Swedish Hosp.,* 59 Wash.2d 545, 548, 368 P.2d 897 (1962). Since all of the plaintiffs' causes of action currently remaining before this court are tort claims, the *Wahpat* plaintiffs must, in response to defendants' motion, demonstrate evidence of the "economic loss" that they allege in the complaint. Joint Consolidated Complaint (Ct.Rec. 15) at 10.

As the plaintiffs' interrogatory answers demonstrate, the plaintiffs have responded to the defendants' continuing demand for specific evidence of plaintiffs' alleged injury with either vague, conclusory allegations or claims that discovery is continuing regarding this issue. *See* Defendants' First Set of Interrogatories Direct to Each Plaintiff at 28–30 attached as Exhibit C to Ct.Rec. 402.[7]

To resist summary judgment, however, caselaw clearly shows that the parties must go beyond the pleadings and designate significantly probative facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. The nonmoving party cannot successfully oppose a motion for summary judgment solely on the basis of conclusory allegations which are not "backed up by statements of fact." *Shane v. Greyhound Lines,* 868 F.2d 1057, 1061 (9th Cir. 1989); *Taylor v. List,* 880 F.2d 1040 (9th Cir.1989); *Angel v. Seattle–First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir.1981); *Marks v. United States,* 578 F.2d 261, 263 (9th Cir. 1978). The plaintiffs do not meet this burden.

## i. Dr. Welsh's Declaration Provides No Evidence of Economic Injury

In an effort to demonstrate the existence of a genuine issue regarding their economic injury, the plaintiffs proffer the expert testimony of Dr. Welsh:

"With respect to Defendants [sic] fact number 15 [in which defendants state that plaintiffs have not produced any evidence tending to prove that they suffered any economic losses], the plaintiffs dispute this paragraph in its entirety. Plaintiffs direct the court's attention to the declaration of Dr. Welsh at pp. 5, para. 11 to p. 14."

Plaintiffs' Statement of Facts (Ct.Rec. 498) at ¶ 6.[8] In other words, the plaintiffs, to establish proof of their personal economic losses, refer the defendants and the court to their expert fisheries biologist. Dr. Welsh's declaration, however, at best would only establish a genuine issue regarding whether Hanford operations damaged the Columbia River fishery. He never ties his hypotheses regarding Hanford operations' impact on the salmon to

---

7. When pressed at oral argument to demonstrate specific facts regarding the economic injury suffered by the plaintiffs, counsel indicated that at the outset of this litigation, there was certain evidence indicating that the fisheries had been taking in less salmon during the years of the operation of the reactors. Counsel also indicated that the plaintiffs had given testimony regarding the injuries they suffered. However, counsel stated that he had "no answer," when asked why this evidence had not been presented to the court in order to resist this dispositive motion.

8. According to ¶ 5 of their statement of facts, plaintiffs do not dispute the contents of their interrogatory responses to which the defendants refer to demonstrate plaintiffs' lack of evidence regarding economic injury. Plaintiffs note, however, in ¶ 5 that they are updating these interrogatory responses to incorporate Dr. Welsh's statement.

the plaintiffs—he provides no evidence of *how* the negative effects of Hanford operations on the Columbia fish caused economic injury to the particular plaintiffs in this lawsuit. The closest Dr. Welsh comes to relating his theories to the plaintiffs is when he discusses data reflecting a decline in commercial landings of fall chinook in the Columbia. Welsh Declaration (Ct.Rec. 501) at ¶ 18. However, examination of Dr. Welsh's declaration confirms that his appraisal has been restricted *solely* to a scientific analysis of the effects of reactor effluent. His conclusion does not reach economic ramifications. In sum, it is somewhat disingenuous for the plaintiffs to argue that they have succeeded in demonstrating evidence of their claimed injury through reference to Dr. Welsh's declaration.

### ii. Economic Injury Must Be Independently Proven

The plaintiffs appear to be laboring under the misconception that if they can demonstrate proof that the Hanford operations adversely impacted the salmon population, then it automatically follows that they sustained economic injury. Their faulty reasoning is revealed in their statement of facts:

> [T]he plaintiffs dispute that releases from Hanford have had no discernible effect on the fish. Initially, the plaintiffs experts should be entitled to engage in full discovery prior to refuting this ultimate question of fact in its entirety. However, at this juncture, Dr. Welsh's declaration does provide the requisite framework to establish how, at a minimum, the fish, *and therefore the plaintiffs fishing industry, in the Columbia River has been negatively impacted.*

Plaintiffs' Statement of Facts (Ct.Rec. 498) at ¶ 8. Thus, the plaintiffs effectively argue that if they can prove a decline in the fish runs during the years of effluent discharge, then the court can presume that they caught less fish during that time. However, while the law surrounding summary judgment requires the court to draw all inferences in the light most favorable to the plaintiffs, plaintiffs must still support such inferences by presenting affirmative evidence of any element essential to their case. Proof of the damage to the fishery would only constitute proof of a potential *cause* of economic injury, not the actual injury itself.

By pointing to the plaintiffs' lack of evidence regarding economic harm, the defendants have met their burden on summary judgment. *See Maffei v. Northern Ins. Co. of New York,* 12 F.3d 892, 899 (9th Cir.1993) (to meet its burden of proof on summary judgment, the moving party need only identify the nonmoving party's failure to produce evidence). In doing so, the defendants have shifted the burden to the plaintiffs. Rather than responding substantively, plaintiffs have attempted to circumvent their burden by collapsing two distinct elements: causation and injury. The court, however, has indicated in the recent past that it expects parties to demonstrate specific evidence of *each* element of their case when challenged on summary judgment.

### iii Plaintiffs Must Still Produce Affirmative Evidence Notwithstanding the Speculative Nature of Their Injury

In their Supplemental Affidavit in Opposition to Defendants' Motion for Summary Judgment,[9] the plaintiffs provide the alternative argument that any depletion of

9. The court notes for the record that this document was filed on January 18, 1995, one day prior to the hearing on this motion and in clear violation of Local Rule 56. However, pursuant to the Ninth Circuit's recent decision in *Marshall v. Gates,* 44 F.3d 722 (9th Cir.1995), the court finds that it is obliged to consider this document as it pertains to this motion. Had the court determined that this document even suggested some significantly probative evidence pertaining to this motion, the court would have been obliged to allow opposing counsel additional time to respond to it. Not only would this ex-

tend a schedule already protracted at plaintiffs' request, it would skew a case management schedule involving many other issues. Sanctions in any form cannot remedy that result. This is the type of unfortunate consequence produced by the *Gates* decision, and it reflects a certain insensitivity towards the district courts' burden of managing their caseloads efficiently and realistically. However, the court is not required to postpone decision on this motion due to this eleventh hour submission as it provides no specific facts relating to the issues of causation and injury raised by this motion.

the fish resource is evidence of economic injury because it constitutes lost profits. Supplemental Affidavit (Ct.Rec. 515) at ¶ 4. This argument is also indirectly suggested by the plaintiffs' responsive memorandum, wherein they assert that the effluent released by defendants may have caused the salmon to refuse to enter the Columbia River, which "in turn also causes a reduced number of salmon *available* to the American Indian fishers (emphasis added)." Plaintiffs' Memorandum (Ct.Rec. 496) at 6. However, such a claim of lost profits would not relieve plaintiffs of their burden of providing specific facts on which a finder of fact could reasonably conclude that they "actually suffered damages ... in any quantifiable amount." *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 808–09 (9th Cir.1988) (summary judgment upheld where nonmoving party failed to provide any evidence regarding the amount of damages). In *McGlinchy*, the Ninth Circuit held:

> Some sort of study estimating the amount of damages was essential to appellants' case.... [T]he plaintiffs "must provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award.... Summary judgment is appropriate where appellants have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages."

*Id.* at 808 (*quoting Dolphin Tours v. Pacifico Creative Serv.*, 773 F.2d 1506, 1509–10 (9th Cir.1985)). Washington similarly requires parties alleging lost profits to provide some affirmative evidence of the proper estimation of such damages. *See Lundgren v. Whitney's, Inc.*, 94 Wash.2d 91, 97–98, 614 P.2d 1272 (1980) (tort action in which court held that lost profits are a recoverable element of damages to the extent evidence permits their estimation with "reasonable certainty"). Moreover, the plaintiffs explicitly seek recovery for lost income and lost earning capacity in their complaint (Ct.Rec. 15 at 45–46); therefore, their mere assertion that the depletion of the fish resources deprived them of lost business opportunity or lost profits is nothing more than a reiteration of the allegations in their complaint—this is insufficient to defeat summary judgment.

Thus, the plaintiffs' failure to establish a genuine issue regarding this distinct element of their case warrants the court's award of summary judgment. The plaintiffs provide absolutely no specific facts which would suggest they suffered economic loss. There is, for example, no comparison between revenues during the years when the Hanford reactors discharged effluent and those years where the reactors were inoperative. Likewise, the plaintiffs make no attempt to project what their catches would have been had the Hanford reactors not depleted the fish resource. Rather, plaintiffs leave the court with nothing but their insistence that such injury actually occurred.

Since a party's failure of proof on any essential element of the nonmoving party's case necessarily renders all other facts immaterial, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), the court may grant summary judgment solely on the plaintiffs' failure to produce evidence of injury, without reaching the discussion of the scientific evidence regarding Hanford's effect on the Columbia fish. However, for the sake of thoroughness, the court also considers whether plaintiffs can demonstrate causation.

**B. Plaintiffs Demonstrate No Genuine Issue Regarding Damage to the Columbia River Fishery**

Defendants additionally move for summary judgment on the grounds that, besides being unable to establish evidence of their economic injury, the plaintiffs cannot establish any causal connection between the defendants' Hanford operations and any decline in the salmon runs. *See* Ct.Rec. 401 at 10. To prove that no such causal connection exists, the defendants provide an array of scientific studies regarding the effects of Hanford effluent on the Columbia salmon, as well as objective data, which they claim supports their argument that no adverse effects from their Hanford operations ever occurred.

Plaintiffs' expert, Dr. Welsh, does not dispute any of the evidence produced by defen-

dants which suggests that the radioactivity present in the reactor effluent had no direct adverse impact on the Columbia River fish.[10] Rather, his declaration is limited to identifying two particular negative effects attributable to the reactor discharges of the cooling water: 1) increasing Columbia River temperatures; 2) impairing the homing ability of the salmon.

The defendants challenge the admissibility of Dr. Welsh's declaration on the ground that it is completely unsupported and speculative. Defendants also contend that even if the court should consider this evidence, it does not create a genuine issue for trial, when viewed in light of the objective data regarding the fish population and spawning nests.

### i. Dr. Welsh's Testimony is not Admissible under the *Daubert* Standard

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct 2786, 125 L.Ed.2d 469 (1993), the Supreme Court revised the standard regarding the admissibility of expert testimony. The Supreme Court rejected the "general acceptance" test propounded in *Frye v. United States*, 293 F. 1013, 1014 (1923) in favor of a two-part analysis. The Supreme Court remanded this case back to the Ninth Circuit for application of the new standard. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995), the Ninth Circuit proffered

detailed guidance regarding the application of this new standard by the trial courts.[11]

Under the first prong of the *Daubert* standard, the court must determine "whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.'" *Id.* at 1315–16; *citing Daubert*, —— U.S. at ——, ——, 113 S.Ct. at 2795, 2797. Under the second prong of the analysis, the trial court must determine whether the expert testimony "will assist the trier of fact." *Id.* at 1320.

To determine the scientific validity of the expert testimony, the Ninth Circuit emphasized that the courts *cannot* rely upon the expert's "bald assurance of validity." *Id.* at 1316. Rather, "some objective, independent validation of the expert's methodology" is required. *Id.; see also Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (holding that a party cannot resist summary judgment unless the district court determines that the expert's conclusions are based upon scientific methods and procedures, "not mere subjective beliefs or unsupported assertions").

Several factors to be considered in determining the admissibility of expert testimony are: whether the theory is generally accepted in the scientific community; whether it has been subjected to peer review and publication; whether it can be and has been

10. Indeed, the plaintiffs explicitly concede the validity of the laboratory studies performed by Dr. Donaldson, Dr. Bevan, and Dr. Nakatani. In their memorandum, plaintiffs state, *"Even though* all of the laboratory tests showed no adverse effects on salmon attributable to constituents in the reactor discharges, there is a strong avoidance factor operating which requires additional discovery from the defendants (emphasis added)."* The plaintiffs actually repeat this phrase three times in their memo. *See* Plaintiffs' Memorandum (Ct.Rec. 496) at 6, 11, 13. Thus, plaintiffs do not assert that defendants' experts' studies are incorrect, rather, they claim that these studies have not addressed the issue of whether or not the effluent has caused the fall Chinook to refuse to enter the Columbia River. *See* Ct.Rec. 496 at 11. In fact, the only conclusion of defendants' experts that plaintiffs appear to contest is Dr. Nakatani's statement that the thermal effects from Hanford reactor effluent did

not adversely affect the fishery in the Columbia River. To the extent plaintiffs do not dispute the studies provided by defendants, the court may assume that they are deemed to exist without controversy. *See* Local Rule 56(c).

11. In *Daubert*, plaintiffs charged that defendants' drug, Bendectin, caused their birth defects. Defendants brought summary judgment on the ground that plaintiffs could demonstrate no admissible evidence that this drug actually caused such defects. On summary judgment, defendants' and plaintiffs' experts provided opposing conclusions regarding whether Bendectin caused birth defects. Despite the conflicting opinions, the Ninth Circuit affirmed the district court's award of summary judgment to the defendants, finding that the plaintiffs did not demonstrate a genuine issue of material fact since their experts' testimony was inadmissible under the new *Daubert* standard. *Id.* at 1322.

tested. *Id.*, 43 F.3d at 1316.[12] The Ninth Circuit identifies a particularly compelling factor as "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation...." *Id.* at 1317. Such independent research provides a strong sign that the research comports with the dictates of "good science." *Id.*

If the expert testimony is not based on such independent research, then the party proffering it must come forward with some other "objective, verifiable evidence that the testimony is based on 'scientifically valid principles." *Id.* at 1317. One way to demonstrate this is by proving that the research and analysis have been subjected to "normal scientific scrutiny through peer review and publication." *Id.*

Applying the standard articulated above to the testimony of Dr. Welsh in opposition to the motion for summary judgment, it is clear that neither of his theories are properly admissible under the *Daubert* standard.

### a. Salmon Olfactory Cues

■ Dr. Welsh expresses his professional opinion that the reason that salmon are able to return to their natal streams for freshwater spawning is that during their migration to the sea, they store odor cues in their brain as they pass major tributaries. He explains further that during their return journey, they retrieve this information and use it to guide them. From this premise, Dr. Welsh concludes that the reactor effluent altered the odor of the Columbia River water in the Hanford Reach. He hypothesizes that this effluent *may* have disrupted odor cues for adult salmon returning to the Columbia River, which would have caused confusion, delays, and straying by the salmon. According to Dr. Welsh, some fish *may* have missed the narrow time window required for successful spawning. He projects the ultimate effects

this odor cue disruption may have had: "If a sizeable number of returning Hanford Reach fall chinook spawned in the lower Snake River, that *may* have resulted in disruption of the indigenous salmon gene pool and all of the long-term survival problems associated with such dilutions (emphasis added)." Welsh Declaration (Ct.Rec. 501) at ¶ 19.

The novel and utterly speculative nature of this theory is inescapably clear as Dr. Welsh provides not one shred of evidence in his declaration which even remotely supports or verifies his theory. There is nothing in either his declaration or attached resumé which indicates that he has ever actually subjected his theory to the kind of independent research and experimentation endorsed by *Daubert.* Furthermore, he makes no claim that his idea is generally accepted in the scientific community. Nor does Dr. Welsh compensate for his lack of independent experimentation regarding his theory by supplying any accompanying documentary evidence of any kind which would indicate that this theory has ever been subject to peer review and publication inviting scrutiny from the scientific community.

In addition, plaintiffs, in their responsive memorandum similarly provide nothing which would validate Dr. Welsh's opinion as anything more than sheer conjecture. Rather, plaintiffs discuss a study wherein certain salmon were blinded and/or had their noses plugged. (Ct.Rec. 496 at 10). The plaintiffs note that the blinded fish returned to their native hatchery at rates similar to the undamaged control group of salmon, demonstrating that salmon primarily rely upon their sense of smell for homing purposes. (Ct.Rec. 496 at 10–11). Plaintiffs provide a brief description of another study which also emphasizes the likelihood that salmon use olfactory cues to guide their migration. (Ct.Rec. 496 at 11). However, the plaintiffs provide no exhibits or affidavits indicating the

---

12. In *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502–03, the Ninth Circuit elaborated on the importance of testing hypotheses:

"In order to qualify as 'scientific knowledge,' ... an inference must be derived by the scientific method." ... Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly,

scientists may form initial hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

source of these experiments, and, even assuming the scientific validity of such studies, they in no way support Dr. Welsh's hypothesis that the Hanford reactor effluent *impaired* the olfactory homing mechanism of the salmon.

Left without any independent evidence to support Dr. Welsh's hypothesis regarding salmon olfactory impairment, the court must conclude that this opinion has been developed simply for purposes of withstanding the defendants' motion for summary judgment.[13] Dr. Welsh's theory fails in every possible way to satisfy the first prong of the *Daubert* two-part test. Mere suspicions and hunches cannot meet the *Daubert* requirements and are therefore inadmissible for consideration on summary judgment.

### ii. Thermal Effects

■ In contrast, Dr. Welsh's second inference regarding the possible thermal effects of the discharges of the reactor cooling water upon the Columbia River fish ostensibly appears to satisfy the requirements of *Daubert.* Unlike his theory regarding the disruption of the salmon olfactory homing mechanism, Dr. Welsh actually provides some calculations to accompany his conclusion that the discharges may have raised the temperature of the Columbia River between 3° to 6° Fahrenheit over its ambient temperatures. *See* Welsh Declaration (Ct.Rec. 501) at ¶¶ 17–18. However, Dr. Welsh is forced to recognize, due to the lack of solid data, that his account is but a mere projection:

Until I obtain definitive data on volumes and temperatures of reactor cooling water entering the Columbia River and compare those effluent volumes and temperatures on the flows of the Columbia River at the end of the pipes, *I am unable to model the temperature regime and predict the effects* on salmon spawning, embryonic development rates, timing of fry emergence from the redds, growth of juvenile salmon, and emigration. *Until then I am obliged to rely on vague information in affidavits supplied by expert witnesses hired by the defendants....* In the absence of definitive data on Columbia River flows in the Hanford Reach at the end of the effluent discharge pipes, and volumes and temperatures of the effluent at various points along the 15–20 miles where effluent entered the river, I can make only the following crude calculations in reference to the effects of thermal additions on salmon (emphasis added).

Welsh Declaration (Ct.Rec. 501) at ¶ 17. Thus, Dr. Welsh himself concedes that his calculations are not entirely dependable. He confesses that he does not know the exact temperature of the effluent released to the Columbia. Welsh Declaration at ¶ 17 (noting that it "may have been 180° F or perhaps higher"). He additionally refers to the cooling capacity of retention ponds on the discharged effluent; however, he apparently does not factor them into his calculations, because he does not have any information on them. Moreover, Dr. Welsh makes general, unsupported assumptions regarding the Co-

13. The court notes, in comparison, that the defendants' experts' have all provided testimony regarding matters which have essentially been their lives' work. The work and research they discuss in their testimony has inarguably been independent of this litigation. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) (noting a distinction between experts who testify regarding matters growing directly out of research they have conducted independent of the litigation and those experts who develop opinions expressly for purposes of testifying).

The court also notes that there is a qualitative difference between the opinions provided by the defendants' experts and those of Dr. Welsh. The defendants' experts describe the tests and studies they personally conducted which provide the basis for their conclusions regarding the effects of

reactor effluent on the Columbia fish. In addition, they list, and often provide copies of, publications which indicate that their theories have been subject to the peer review generally reflecting the *Daubert* requirement that an expert's opinion be in accordance with the scientific method. *See e.g.* Exhibit 1 attached to Nakatani Affidavit (includes publications discussing thermal effects).

Even if the court were to determine that defendants' experts' also failed to meet the standards imposed by *Daubert,* this would not preclude the court from awarding them summary judgment. By alleging a lack of evidence regarding damage to the Columbia fish, the defendants successfully shift the burden to the plaintiffs to come up with such evidence. *See Maffei v. Northern Ins. Co. of New York,* 12 F.3d 892, 899 (9th Cir.1993); *Daubert,* 43 F.3d at 1315.

lumbia River's rates of flow through the Hanford Reach, in order to determine how much dilution effect the river had upon the effluent introduced into it. The degree of uncertainty present in his estimates on this critical figure singularly reveals Dr. Welsh's conclusion as nothing more than educated guesswork.

Similar to the deficiencies in his salmon olfactory homing mechanism theory, Dr. Welsh does not corroborate his ambivalent conclusion that the effluent discharges *may* have caused the three to six degree rise in the temperature of the Columbia with any evidence of independent experimentation or peer review. In addition, rather than being generally accepted by the scientific community, his conclusion appears to be merely his private assessment. Thus, this hypothesis also fails to fulfill the first part of the *Daubert* test.[14]

### C. Plaintiffs Concede the Validity of the Objective Data Provided by Defendants' Experts

■ By failing to contest the objective data compiled by the defendants' experts in their exhibits reflecting fluctuations in the fall chinook population, commercial landings, and redd counts, the plaintiffs may be deemed to have admitted their validity. *See* Local Rule 56(c) (court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by the party opposing the motion for summary judgment). There is nothing in the plaintiffs' brief or statement of facts which questions the validity of the various tables and charts included by the defendants which measure fish counts, commercial fish landings, and the development of the salmon redds. Plaintiffs do not even suggest that this data may be partially incorrect. Yet, upon examination, this objective data completely undermines the plaintiffs' claim that the Columbia River fishery has been

damaged through the releases of Hanford reactor effluent.

Rather than contesting this objective data, the plaintiffs attempt to manipulate portions of it to support their claim that the effluent has adversely affected the salmon. In his declaration, Dr. Welsh concludes that the three to six degree increase in temperature which he projects would accelerate the rate at which developing salmon would leave their spawning nests, or redds. He further states that disturbing the timing of this process would "seriously impact population fitness." Welsh Declaration (Ct.Rec. 501) at ¶ 17. To justify this conclusion, Dr. Welsh points to some of the exhibits attached to the affidavits of defendants' experts:

> Such an effect need not be catastrophic ... but would be more subtle and would persist for numerous generations. *In fact, that is exactly the picture that emerges for fall chinook in an examination of Figure 24 and Table 3.1 contained in Exhibit 13 of the D.E. Bevan Affidavit.* Commercial landings of fall chinook in the Columbia River and salmon redd counts of fall chinook in the Hanford Reach declined dramatically in 1949, four years after the first large volumes of atomic reactor cooling water effluent were discharged into the Hanford Reach. The number of salmon redds declined from 787 in 1948 to only 65 redds in 1955.... In the seven years (1958–1964) when all eight single-pass reactors were operating, the mean salmon redd count in the Hanford Reach was 974 redds. During the seven years (1965–1971) when the reactors were being deactivated, the mean salmon redd count was 3,375 redds, more than a three-fold increase. In the last seven years that the Hanford Reach salmon redd count are presented in Table 3.1 [of Dr. Bevan's exhibit # 14], the mean redd count is 7,239, more than a seven-fold increase since the atomic reactors ceased discharging effluent into the Columbia River (emphasis added).

---

14. In an effort to substitute for his lack of research and experimentation, Dr. Welsh indicates that, in formulating his analysis of thermal effects, he relies upon the data supplied by the defendants' expert witnesses. *See* Welsh Affidavit at ¶¶ 8, 17. However, the fact that Dr. Welsh might use some of the data provided by defendants' experts would not relieve him of the obligation to validate his ultimate conclusion based on that data as being based on scientific knowledge in accordance with the scientific method. Dr. Welsh fails in this regard.

Welsh Declaration (Ct.Rec. 501) at ¶ 18. As the defendants correctly observe, the problem with Dr. Welsh's analysis is that he is selective in his choice of supporting data, focusing only on those fragments of data which tend to lend credence to his theory.

However, as noted above, the plaintiffs tacitly concede the validity of these exhibits in their entirety, and, when examined in their entirety, the defendants' exhibits show no correlation between the discharges of effluent into the Columbia River and the fluctuations in salmon population. For example, although Dr. Welsh does not dispute the fact stated by the defendants that the peak years of reactor discharges were between 1958 to 1965, he chooses to summarize and focus solely upon the salmon redd count data for the years 1948 to 1955. While he does accurately point to a downward trend in the spawning nests during those years, he neglects to mention that just three years after that period, 1958, the redd count had recovered and jumped up to 1215. *See* D.D. Dauble & D.G. Watson, *Spawning and Abundance of Chinook Salmon (Oncorhynchus Tshawytscha) in the Hanford Reach of the Columbia River,* Table 3.1, Summary of Peak Redd Counts for 10 Designated Areas, 1948–1988, attached as Exhibit 14 to Ct.Rec. 403. In fact, during the four years [15] after that period conceded to be the peak years of discharge, the table cited by Dr. Welsh shows that the redd counts grew at a steady rate from 1260 in 1962, to 4322 in 1969.[16] Dr. Welsh does not dispute this increase or even address it in any fashion.

Dr. Welsh's failure to account for the increases in redd count during the years corresponding to peak reactor discharges undermines his subsequent attempt to show that the deactivation of the Hanford reactors produced positive growth in the salmon redds. Dr. Welsh states that during the seven years when the reactors were in the process of being deactivated (1965–1971), the salmon redd count increased three-fold. He also notes that in the last seven years presented in Table 3.1 of the *Spawning and Abundance of Chinook Salmon* report, there was more than a seven-fold increase in the salmon nests. Dr. Welsh again exploits particular fragments of this data in an effort to support the favorable inference that the Hanford reactors had negatively impacted the salmon redds. However, Dr. Welsh again fails to explain how there could have been nearly a three-fold increase in the redd count during those years corresponding to the peak period of discharges, when all Hanford reactors were operating. Thus, when considered in the context of all of the data regarding salmon redd counts, the probative effect of the increase cited by Dr. Welsh is negated.

Similarly, when discussing the chart which maps the Columbia River fall chinook commercial landings, Dr. Welsh chooses only to mention the significant drop that occurred in 1949, without addressing the future years represented in the chart. *See* Welsh Declaration (Ct.Rec. 501) at ¶ 18. Defendants, however, draw attention to the text which summarizes this chart and thereby places the 1949 decrease in context. The text of the report containing this chart acknowledges a decline in the landings in the late 1940's but also points out that after this decline, the level of commercial landings remained stable from the 1950's through the 1980's. *Status Report, Columbia River Fish Runs and Fisheries, 1938–91,* Washington Dept. of Fisheries and Oregon Dept. of Fish and Wildlife at 19; Figure 24, and; Table 7 attached as Exhibit 13 to Ct.Rec. 403. The report also does not attribute any decline in commercial landings to Hanford operations but rather points out that the decline in the 1940's was coincident with a large increase in the ocean fishery on chinook salmon. *Status Report,* at 19.

---

15. Both the defendants' experts as well as Dr. Welsh agree that to determine the effect of effluent discharge on salmon runs, the number of salmon returning four years *after* the discharge must be examined. Salmon population declines would first be noticed four years after the first brood-year fish are affected. *See* Welsh Declaration at ¶ 18.

16. Dr. Bevan points out that it "is most unlikely that salmon spawning would have occurred in the Hanford Reach in the very high numbers that it did during 1962–1971 if there had been any adverse effects on the salmon from the Hanford releases.

Defendants also provide fish count data which further indicates objectively that there was no significant depletion in the fish resource. Table 2 of the *Status Report,* which is referenced by Dr. Bevan, reflects total numbers of the salmonid fish run entering the Columbia each year from 1938 through 1991. Comparing the years 1962–1969 (those years corresponding to the peak discharges) reveals that these numbers do not differ greatly from the totals for years both before and after this period. Similarly, a review of Table 34 of the *Status Report,* which summarizes the numbers of upriver fall chinook returning to the Columbia, reveals no decreases in the size of the fish run during the years corresponding to peak discharges. *Status Report,* at 126. Rather, the fluctuations during those years are not distinguishable from either preceding or subsequent years. Once again, Dr. Welsh never contends that these figures are inaccurate or misleading, nor does he ever endeavor to explain them.

The plaintiffs also completely fail to address the possibility that other sources may have been responsible for depressed fish counts in the Columbia over certain years. In fact, Dr. Welsh agrees that

> [n]umerous hypotheses can be formulated in an attempt to explain the drastic decline in fall chinook salmon commercial landings, total number of fall chinook entering the Columbia River, and the decline in fall chinook salmon redd counts during the late 1940's to the late 1950's (emphasis added).

Several of these possible causes enumerated by the defendants' Dr. Milo Bell are non-Indian fishing, logging operations, and, most significantly, the construction of dams. Both Dr. Bell and Dr. Bevan stress that the construction and operation of dams has always been disruptive to the passage of fish, which may have both immediate and prolonged negative effects on the salmon population. Bell Affidavit at ¶ 42; Bevan Affidavit at ¶ 53. Dr. Bell points out that the only significant decline in Native American fishing, which occurred between 1957 and the early 1960's, was caused by the construction of the Dalles Dam. Bell Affidavit at ¶ 58. Since, again, neither the plaintiffs nor Dr. Welsh

bother to address or contest these other potential causes of harm, they may be deemed to admit these other possibilities.

By demonstrating the possibility that any actual declines in the fishery may be attributed to these other sources, the defendants' experts discredit plaintiffs' attempts to establish a causal connection between the alleged harm to the Columbia fishery and the defendants' Hanford operations. Even assuming that such a depletion of the fish can be established, Dr. Bell's testimony questions whether Hanford can be considered the cause of this harm.

This court has previously rejected a non-moving party's attempt to manufacture a genuine issue of material fact by construing isolated portions of objective data without placing these extreme examples in context. *See* Order Granting Motion of Westinghouse Defendants for Summary Judgment at 17. It is faced with a similar situation here. However, when the data in question is considered as a whole, it not only fails to support plaintiffs' contentions but, in fact, it compels the conclusion that there is no correlation between the Hanford reactor effluent releases and the fluctuations in the salmon population of the Columbia River. Thus, this objective data which the plaintiffs concede precludes them from demonstrating the essential element of causation.

### D. Plaintiffs' Request for Further Discovery is not Justified

Although the plaintiffs provide the testimony of Dr. Welsh in an attempt to establish a genuine issue for trial, the crux of their argument is that the defendants' motion is untimely since plaintiffs have not yet been afforded an opportunity to conduct sufficient discovery. They point out that the court has carefully crafted a case management order which has broken discovery into several phases to facilitate its orderly progression. Supplemental Affidavit (Ct.Rec. 515) at 2.

Plaintiffs contend that, pursuant to this case management order, their ability to conduct discovery into the areas of causation and liability has been limited, since those phases of discovery have not yet commenced. Plaintiffs' Memorandum (Ct.Rec. 496) at 13.

They further maintain that by providing such a rigidly defined discovery schedule, the court has implicitly suggested that any dispositive motions filed must be confined to those issues on which discovery has been conducted. (Ct.Rec. 496 at 13). Based on this, the plaintiffs argue that the court should either postpone its decision until full discovery is conducted according to the current schedule or, in the alternative, the court should issue a separate amended discovery schedule specifically designed to allow the *Wahpat* plaintiffs sufficient time to garner the information necessary to defend against defendants' assertions. Supplemental Affidavit (Ct.Rec. 515) at 3.

Under Fed.R.Civ.P. 56(f), upon the non-moving party's request, the court may deny a motion for summary judgment or grant a continuance if the nonmoving party needs additional time to discover "facts essential to justify the party's opposition" to the motion. *See Terrell v. Brewer,* 935 F.2d 1015, 1017 (9th Cir.1991). As the Supreme Court has noted, a party should not be " 'railroaded' by a premature motion for summary judgment." *Celotex Corp.,* 477 U.S. at 326, 106 S.Ct. at 2554. "Thus, Rule 56(f) allows a party who has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2740 at 530. The trial court's denial of a motion under Rule 56(f) is reviewed for abuse of discretion. *Beneficial Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271, 277 (9th Cir.1988); *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.,* 784 F.2d 1472, 1475 (9th Cir.1986).

■ The party seeking additional discovery bears the burden of showing what specific facts she hopes to discover that will raise an issue of material fact. *Terrell,* 935 F.2d at 1018; *Hall v. Hawaii,* 791 F.2d 759, 761 (9th Cir.1986); *cf. Mackey v. Pioneer Nat'l Bank,* 867 F.2d 520 (9th Cir.1989) (party

must show how additional discovery would preclude summary judgment, and why the party cannot immediately provide specific facts demonstrating an issue of material fact). The party opposing summary judgment also bears the burden of showing that the evidence sought actually exists. *Terrell,* 935 F.2d at 1018; *see also VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.,* 784 F.2d 1472, 1475 (9th Cir.1986). "Denial of a Rule 56(f) application is proper where it is clear that the evidence sought is almost certainly nonexistent or is the object of pure speculation." *Terrell,* 935 F.2d at 1018. "The non-movant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts...." *United States v. $5,644,540.00 in United States Currency,* 799 F.2d 1357, 1363 (9th Cir.1986).

■ Plaintiffs do not point to any specific facts they have yet to discover that would vindicate Dr. Welsh's theory regarding the effluent's disruption of the salmon olfactory homing mechanism. With regard to this theory, they make only the following claim: "These effluents significantly impaired the salmon's olfactory cues. Even though all of the laboratory tests display [sic] reviewed by the defendants' experts indicate no adverse effects on salmon, attributable to the reactor discharges, there is a strong avoidance factor operating which requires additional discovery by the plaintiffs." Plaintiffs' Memorandum (Ct.Rec. 496) at 13. Nothing in either the plaintiffs' or defendants' submissions gives even the faintest indication that any such evidence relating to olfactory impairment exists. Even Dr. Welsh, the authority for this theory, does not indicate what information he requires from defendants to investigate his olfactory impairment theory more thoroughly. The court is convinced that any evidence sought in relation to this wholly unsubstantiated theory is the object of plaintiffs' pure speculation.[17]

Plaintiffs do, however, specify information required to develop further Dr. Welsh's hy-

---

**17.** Plaintiffs also attempt to justify the need for further discovery by claiming that many of the organic and inorganic compounds have synergistic effects which have not yet been fully explored. *See* Affidavit of Counsel (Ct.Rec. 497) at ¶ 16.

However, like Dr. Welsh's theory regarding the disruption of the salmon olfactory homing mechanism, plaintiffs do not support this bald assertion with any evidence whatsoever.

pothesis regarding the effluent's thermal effects.[18]  Dr. Welsh specifically indicates a need for definitive data on Columbia River flows in the Hanford Reach at the end of the effluent discharge pipes, as well as the volumes and temperatures of the effluent at various points along the area where it entered the river.  Welsh Declaration (Ct.Rec. 501) at ¶ 18.  In addition, to substantiate their claim that evidence of adverse thermal effects of the effluent likely exists, plaintiffs provided the report, *Columbia River Situation—A Semi Technical Review,* attached to their extremely delinquent Supplemental Affidavit.[19]  This 1954 report, although providing absolutely no evidence that any adverse effects ever occurred, does indicate that there was a potential for negative impact upon the Columbia salmon should the reactor discharge contribute to intolerable temperatures in the river water.  *Semi–Technical Review* at ¶ IV.

Even granting, however, that the information sought by plaintiffs actually exists, the court finds that such information would be completely immaterial and incapable of raising a genuine issue for trial.  As indicated previously, the plaintiffs fail to contest the objective data supplied by the defendants which, when considered in its entirety, re-

flects no correlation between the reactor effluent discharges and the variations in the commercial landings, salmon population, and salmon redds.  This data renders all of the plaintiffs' causal theories moot and clearly shows that any further inquiry regarding these hypotheses would be pointless.

Besides failing to justify their inability to provide evidence regarding causation, plaintiffs' plea for additional discovery cannot excuse their failure to provide evidence of the distinct element of injury.  In the first place, it is difficult to see how the plaintiffs can possibly claim that they need more time to conduct discovery regarding their alleged economic injury, since any such evidence of such loss would obviously appear to be within their sole control.  However, while plaintiffs' memorandum is completely silent on this issue, counsel for the plaintiffs explained, during oral argument, why plaintiffs require more time to calculate the damages they allegedly incurred.

Plaintiffs' counsel claimed that before the plaintiffs will be able to estimate with any accuracy the amount of income and profits lost by the plaintiffs, they must conduct discovery regarding causation, the heretofore proscribed issue.  Specifically, plaintiffs contend that until they are able to project to

18.  The court notes what appears to be a mistake in the affidavit provided by plaintiffs' counsel, George Trejo.  (Ct.Rec. 497).  In an attempt to identify a deficiency in the studies performed by defendants' experts, counsel states that the defendants' submissions fail to address the effect of thermal inputs on salmon homing.  *See* Affidavit of Counsel (Ct.Rec. 497) at ¶ 14.  Counsel thus asserts that more discovery is needed in part because this potential consequence has not yet been investigated.

However, defendants' submissions actually do appear to have addressed this issue.  In his affidavit, Dr. Nakatani relates the following:

One concern of fisheries biologists was whether the heated water caused a block in the migration path through the Hanford Reach, on the theory that salmonids would avoid the heated water.  Sonic fish tags were used in the fall of 1967 to track fish movements in the Reach.  The data showed no temperature block for the fish; most fish migrated upstream in relatively shallow waters along the opposite bank from reactor sites.

Thus, despite counsel's claim, this issue does not appear to have been wholly ignored.

19.  The court notes defendants' statement in their reply that all of the information which Dr. Welsh

insists that he requires exists, "if at all, in the documentary record, to which plaintiffs have had access for years."  Reply Memorandum (Ct.Rec. 507) at 17.

Plaintiffs explained that their efforts to examine this documentary record have been impeded due to the classified nature of many documents.  To substantiate this argument, plaintiffs directed the court's attention to the *Semi–Technical Review,* which plaintiffs claimed was only recently declassified.  However, as the court pointed out during argument, this document appears to have been confirmed as declassified in 1981, and certainly no later than 1989, well before this litigation commenced.  Plaintiffs gave no further indication of any particular requests they have made for documentary discovery which have been refused due to classification.  The best counsel can say is: "One of the problems that the plaintiffs are experiencing is the need to discover the quantities, temperatures, and chemical constituents in the effluents from the defendants records which are *probably* classified."  Affidavit of Counsel in Opposition to Defendants Motion for Summary Judgment (Ct.Rec. 497) at ¶ 11.

what extent the reactor effluent depleted the fish population, their expert cannot calculate how much income was lost. Counsel further claimed that although plaintiffs do have some evidence of injury, it has not been made available because the plaintiffs do not wish to foreclose or waive their claims to any damages which have not been fully calculated.

However, this argument does not excuse the plaintiffs' failure to provide any affirmative evidence of their economic injury.[20] Plaintiffs, in responding to this summary judgment, would not need to present evidence establishing their comprehensive damages with exact certainty. Rather, summary judgment imposes a relatively low evidentiary threshold, requiring the nonmoving party simply to provide evidence sufficient to establish the "existence" of each essential element in their case. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, even assuming the validity of the plaintiffs' claim that their expert cannot calculate the amount of profits lost until the exact impact of the effluent on the fish is determined, the plaintiffs could still provide some evidence of their injury such as proof that they caught less fish during the years Hanford reactor effluent was released than they caught in those years prior to or after the releases. In fact, counsel indicated during oral argument that plaintiffs actually have this type of evidence.

However, the court additionally finds that plaintiffs' fear of waiving potential damages is not compelling. The defendants have challenged plaintiffs' ability to provide evidence to substantiate their claim with this dispositive motion. The court cannot rely upon plaintiffs' bald assurances that they have this evidence but are merely reserving it for tactical reasons. The time for plaintiffs to demonstrate *any* evidence they have to back up their claims of economic injury is now.

Furthermore, plaintiffs' misunderstand the basis of defendants' assertion in the motion for summary judgment. Plaintiffs' apparent concern is that if they only demonstrate proof of their lost income by identifying distinctions in their yearly catches, they will be barred from later recovering fully for lost profits attributable to those fish they *could* have caught. However, defendants have challenged plaintiffs' ability to show any kind of economic injury. Thus, it would certainly be conceivable for the plaintiffs to respond to the motion simply by providing evidence of the yearly catch distinctions while preserving their right to assert additional lost profits by indicating that these have not yet been fully ascertained.[21]

## CONCLUSION:

As the court stated during the hearing, it finds the paucity of evidence presented by the plaintiffs in opposition to this motion appalling. The plaintiffs half-heartedly attempt to generate an issue for trial by providing expert witness testimony which is inadmissible for consideration and which would certainly not raise a genuine issue of material fact even if it met the *Daubert* standard. Almost in anticipation of the court's reaction to their expert witness, plaintiffs argue that more time is needed to come up with some substantial evidence.

However, the court cannot countenance the additional attorney time and expense that postponing its ruling on this motion would demand, especially when the court is so thoroughly convinced that further inquiry would not lead to any material evidence to support plaintiffs' claims. Despite over four years of litigating their claims, the plaintiffs are decidedly unable to produce any evidence of either causation or their alleged economic

---

20. During oral argument, counsel for the plaintiffs referred to the injury alleged in the complaint as an injury to a "class." The apparent implication is that if the defendants depleted the fish resource through the releases, then this class of Indian fishers must have caught less fish than they could have. However, the court rejected counsel's characterization, noting that the court has previously considered and ruled against certifying a class. Plaintiffs cannot avoid the need to provide affirmative evidence of their particular injury merely by discussing it in terms of an abstract class.

21. Plaintiffs' concern might be valid if defendants were to challenge separately on summary judgment *different categories* of damages asserted by the plaintiffs. In such a situation, plaintiffs would have to present evidence of each separate category of damages.

injury. In light of the wealth of evidence produced by the defendants, the only conclusion the court can draw to explain plaintiffs' failure is that no such evidence exists. The court will not allow these or any other plaintiffs in this litigation to prolong their participation solely on speculation and conjecture.

Accordingly, defendants' motion for summary judgment against the *Wahpat* plaintiffs is **GRANTED,** and all of the claims of the *Wahpat* plaintiffs are **HEREBY DISMISSED.**

**IT IS SO ORDERED.**